IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

| | | |
|---|---|---|
| AMERISAVE MORTGAGE CORPORATION, | ) ) | Civil Action No. 1:15-cv-3146-RWS |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| FREEDOM MORTGAGE CORPORATION, LES ACREE, and CRAIG WILLIAMSON, | ) ) ) | JURY TRIAL REQUESTED |
| | ) | |
| | ) | |
| Defendants. | ) | |

**AMENDED VERIFIED COMPLAINT**
**FOR INJUNCTIVE RELIEF AND DAMAGES**

This matter reflects egregious and blatant acts of unfair competition and other illegal acts by the Defendants, which include a scheme to raid an entire unit of Plaintiff Amerisave Mortgage Corporation's ("Plaintiff," "AMC," or the "Company") workforce and to steal AMC's account lists and accounts in the process. Using several tactics, including false statements, theft by taking, theft by deception and conversion, fraud and computer theft, Defendants have stolen 18 of 25 employees in the targeted unit and the accounts those employees had while at AMC.

In an effort to obtain a remedy for Defendants' illegal conduct, AMC files this Amended Verified Complaint for Injunctive Relief and Damages and respectfully requests an injunction prohibiting Defendants Freedom Mortgage Corporation ("Freedom"), Les Acree ("Acree) and Craig Williamson ("Williamson") from misappropriating, using or disclosing AMC's trade secret information and prohibiting them from continuing their unlawful unfair competition.  Plaintiff also requests damages resulting from Defendants for misappropriation of AMC's trade secret information and resulting from their (1) tortious interference with contracts that AMC has with its former employees; (2) tortious interference with the business relationships AMC had with its customers; and (3) aiding and abetting breaches of fiduciary duty and duty of loyalty by Williamson and others.  AMC requests injunctive relief and damages related to Williamson's breach of contract and breach of his fiduciary duty and duty of loyalty to AMC.  Against all of the Defendants, AMC seeks relief for (1) fraud; (2) conversion; (3) defamation *per se*; (4) civil conspiracy; (5) computer theft; and (6) violation of the Georgia Racketeer Influenced and Corrupt Organizations Act ("Georgia RICO").  Plaintiff makes the following allegations in support of its request for relief.

## PARTIES, JURISDICTION AND VENUE

1.     AMC is a Georgia corporation with its headquarters located at 3525 Piedmont Road, N.E., 8 Piedmont Center, Suite 600, Atlanta, Georgia 30305.

2.     This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 1332 in that (a) it is between citizens of different states and (b) the matter in controversy exceeds $75,000, exclusive of interest and costs.

3.     Freedom is a New Jersey corporation headquartered at 907 Pleasant Valley Avenue, Suite 3, Mount Laurel, New Jersey.  This Court has personal jurisdiction over Freedom because it transacts business in this jurisdiction and pursuant to the Georgia Long Arm statute, O.C.G.A. § 9-10-91, because Freedom has misappropriated Plaintiff's trade secrets and committed tortious acts against Plaintiff in this jurisdiction.  Additionally, Freedom is subject to this Court's jurisdiction pursuant to the conspiracy theory of jurisdiction.  Freedom may be served with process through its registered agent CT Corporation System at 1201 Peachtree Street NE, Atlanta, Georgia 30361.

4.     Defendant Les Acree ("Acree") is a citizen of the state of Indiana and can be served with process at 10500 Kincaid Drive, Fishers, Indiana 46037.  This Court has personal jurisdiction over Acree pursuant to the Georgia Long Arm statute, O.C.G.A. § 9-10-91 because Acree has committed tortious acts against

Plaintiff in this jurisdiction. Additionally, Acree is subject to this Court's jurisdiction pursuant to the conspiracy theory of jurisdiction.

5.     Defendant Craig Williamson ("Williamson") is a citizen of the state of North Carolina and can be served with process at 1404 Brewer Jackson Court Wake Forest, NC 27587. This Court has personal jurisdiction over Williamson pursuant to the Georgia Long Arm statute, O.C.G.A. § 9-10-91 because Williamson has committed tortious acts against Plaintiff in this jurisdiction. Additionally, Williamson is subject to this Court's jurisdiction pursuant to the conspiracy theory of jurisdiction.

6.     Venue for this action lies in this judicial district and division pursuant to 28 U.S.C. § 1391(b)(2).

## FACTUAL BACKGROUND

7.     AMC is a privately held mortgage lender which serves customers in 49 states and the District of Columbia. AMC offers consumers first mortgage products available on the market and also offers in-house processing, underwriting, closing, and funding services.

8.     Freedom is a multi-billion dollar mortgage lender that operates in many of the same segments as AMC. Freedom is one of AMC's largest competitors in an industry that is highly competitive.

## AMC's Employment of Williamson and His Restrictive Covenants

9.     Among the distinct departments that operate within AMC is the Third Party Origination ("TPO") unit.  This unit employs Account Executives who build relationships with mortgage brokers and banks for the purpose of having those brokers and banks forward potential mortgage loans to AMC.  AMC underwrites, closes and funds those mortgage loans that are generated through the activities and efforts of its Account Executives.  Each Account Executive delivered an average of $5 million in loans and generated approximately $27,000 per month in revenue.

10.    Until on or about February 27, 2014, the TPO unit was headed by Senior Vice President Craig Dodds.  On or about December 20, 2013, AMC hired Williamson as a Regional Sales Manager for the East Central Region of the TPO unit.  In that position, Williamson was responsible for a region that consisted of Florida, Alabama, Mississippi, North Carolina, South Carolina, Tennessee, Kentucky, Ohio, Michigan, Indiana, Pennsylvania, West Virginia, Maryland, Delaware, New Jersey, Connecticut, Massachusetts, Vermont, New Hampshire and Rhode Island.  As the leader of this Region, Williamson was involved in developing strategic plans for the TPO unit and for growing its revenue and profitability.  In this job, Williamson earned over $200,000 a year.

11.     On day he was hired, Williamson executed an AMC Employment Agreement (the "Agreement") which contains certain restrictive covenants.  First, Williamson agreed that he would not solicit AMC employees for positions with other companies that compete with AMC.  The Agreement, a true and correct copy of which is attached hereto as Exhibit 1, provides in pertinent part:

> **Agreement Not to Solicit Employees.**  During the term of Employee's employment by AMC and for a period of two (2) years following the termination of such employment, Employee shall not either directly or indirectly, on Employee's own behalf, on behalf of any other Competing Business, solicit, or attempt to solicit, divert or hire, any person employed by AMC. . . .

(Exhibit 1, § 4).

12.     The term "Competing Business" is defined by the Agreement as "any business organization of whatever form directly engaged in whole, or in relevant part, in any business or enterprise, which is the same as, or substantially the same as, the Business of AMC."  (*Id.* § 2(b)).  The "'Business of AMC'" is defined by the Agreement as "mortgage lending and/or mortgage brokering."  (*Id.* § 2(a)).

13.     The Agreement also contains a non-disclosure covenant which provides:

> a)  Employee agrees that all Confidential Information and Trade Secrets and all physical embodiments thereof are confidential to AMC and will remain AMC's sole and exclusive property. Employee warrants and agrees that s/he will not reproduce, use, distribute, disclose, publish, misappropriate or otherwise

disseminate any Trade Secrets and will not take any action causing, or fail to take any action to prevent, any Trade Secrets to lose its character as a Trade Secret until and unless such Trade Secrets lose their status as Trade Secrets through no fault, either directly or indirectly, of Employee. All Confidential Information, Trade Secrets, and other Company records, files, memoranda, reports, lists, materials, drawings, designs, proposals, plans, sketches, documents, computer programs, disks, computer printouts and the like (together with all copies thereof) relating to the business of AMC, which Employee used, prepared, or came in contact with in the course of, or as a result of, his/her employment, as well as any laptop, cell phone, or other device provided by AMC to Employee for use on behalf of AMC, are the sole property of AMC. Employee shall return all such materials and products to AMC, upon request by AMC or immediately upon the end of his/her employment with AMC.

b) Upon request by AMC, and in any event upon termination of the employment of Employee with AMC, for any reason, Employee will promptly deliver to AMC all property belonging to AMC, including all Confidential Information and Trade Secrets (and all physical embodiments thereof).

(*Id.* § 10(a) and (b)).

14. Under the Agreement:

**"Confidential Information"** is defined in O.C.G.A. § 13-8-51(3) and means data and information relating to AMC's business, regardless of whether the data or information constitutes a Trade Secret as that term is defined by Georgia law, which data or information: (a) is disclosed to Employee or of which Employee becomes aware as a consequence of the employee's relationship with AMC; (b) has value to AMC; (c) is not generally known to competitors of AMC; and (d) which includes, but is not limited to, Trade Secrets, methods of operation, names of customers, price lists, financial information and projections, personnel data, and similar information. . . .

7

\* \* \* \*

> **"Trade Secrets"** is defined in O.C.G.A. § 10-1-761(4) and means any Confidential Information described above without regard to form which: (i) is not commonly known by or available to the public; (ii) derives economic value, actual or potential, from not being generally known to, and not being readily ascertainable by proper means by other persons who can obtain economic value from its disclosure or use; and (iii) is the subject of efforts that are reasonable under the circumstances to maintain its secrecy.

(*Id.* § 2(c) and (d) (emphasis in original)).

15.     Williamson further agreed in pertinent part that:

> During Employee's employment with AMC, Employee shall devote his full business time, attention and energies to the diligent and faithful performance of his duties as an employee of AMC.  Employee shall not, without the prior written consent of the President of AMC, at any time during the term of employment (a) accept employment with, or render services of a business, professional or commercial nature to any other person; [or] (b) engage in any venture or activity which AMC may reasonably consider to be competitive with or adverse to AMC's business, whether alone or with any other person as a partner, officer, director, employee, agent, shareholder, consultant, sales representative or otherwise . . . .

(*Id.* §8).

16.     In addition to this Agreement, Williamson was required, as a condition

of employment with AMC, to comply with AMC's "Outside Employment Policy"

8

(the "Policy").  On December 5, 2013, Williams agreed to comply with the Policy,

which provides in pertinent part:

> Employees may not take an outside job with, or own a significant
> interest in ("significant" is defined as greater than a 5%
> ownership interest) a customer or competitor of Amerisave, any
> financial services company, including but not limited to,
> banking, investments, real estate, insurance, appraisals and debt
> resolution; nor may they do work on their own if it competes in
> any way with the sales of products or services we provide our
> customers. . . Before accepting any outside employment, you
> must receive written approval from human resources authorizing
> such outside employment.

A true and correct copy of the Policy is attached hereto as Exhibit 2.

17.    Further, during his employment with AMC, Williamson acknowledged

he had received, read and understood the policies contained in AMC's Employee

Manual, which includes a reiteration of the Policy.  (Exhibit 3).  Williamson also

once again agreed that he was to "safeguard all information obtained in the course

of performing [his] duties as confidential, unless dissemination has been specifically

authorized by the Company."  (Exhibit 4).

18.    AMC takes reasonable steps to ensure that its confidential information

and trade secrets are protected from disclosure.  In addition to requiring employees

to execute non-disclosure agreements such as Williamson signed, AMC ensures that

its data is contained on secure systems that are password protected.  Furthermore, as

a mortgage company, AMC complies with the data security and confidentiality

requirements imposed by the Consumer Financial Protection Board ("CFPB"), the Federal Trade Commission, the Graham-Leach-Bliley Act and the SAFE Act.

19.     AMC's confidential information and trade secrets are valuable to it because that information cannot be readily ascertainable by its competitors and would, if disclosed, be of significant value to its competitors.

20.     On or about February 27, 2014, AMC terminated the employment of Mr. Dodd.  While Williamson retained his Regional Sales Manager title, he was made the acting Vice President of Sales for the TPO unit by AMC's President, Mr. Ed Abufaris ("Mr. Abufaris"), and began managing not only the Account Executives, but also the three other Regional Managers, Ed Orozco, Michael Jones and Gary Cain, and their Account Executives.  Thus, Williamson was responsible for, among other things, training, mentoring and managing all of the TPO Regional Managers and Account Executives, establishing objectives and performance goals to increase market penetration, revenue and profitability, and for developing strategies for building and maintaining the TPO unit's account base and marketing. In this role, Williamson had access to AMC's customer relationship management ("CRM") system in which all of the TPO account information was stored.  The CRM is password protected and Account Executives have access only to their assigned accounts, but as the acting Vice President of Sales, Williamson could view the

account information, including revenue and contact information, for every TPO unit account.

## The Scheme to Raid AMC's TPO Unit and Misappropriate Its Confidential Information

21.    Prior to his employment with AMC, Williamson had been employed by Freedom.  In the spring of 2015, representatives of Freedom, including upon information and belief Acree, met with Williamson and hatched a plan to, through the use of fraudulent representations by Williamson, raid AMC of its entire TPO unit.  Although Freedom and Acree knew that Williamson had executed the Agreement with AMC, they nevertheless conspired with Williamson to make him Freedom's recruiting agent and to secure for Freedom AMC's TPO unit's employees and accounts.  Freedom and, upon information and belief, Acree, told Williamson that Freedom would employ him if he violated his Agreement with AMC and successfully solicited every employee in AMC's TPO unit to join Freedom.

22.    Thereafter, at the instigation and urging of Freedom and Acree, and in violation of his Agreement and the Policy, Williamson effectively ceased working for AMC and began working for Freedom, or at least providing services to AMC's competitor by becoming Freedom's recruiting agent, all at AMC's expense.

23.    Following the inception of this scheme, Williamson began denigrating AMC to the TPO unit employees he managed.  For example, in April and May of

2015, Williamson repeatedly told the employees that AMC's mortgage rates were higher than its competitors, a claim that was generally untrue since rates among mortgage companies routinely fluctuate. Additionally, with Freedom and Acree's knowledge and approval, Williamson told the TPO unit employees that AMC was closing the TPO unit. Additionally, Williamson told the TPO unit employees that AMC was unprepared for the new Truth-in-Lending/RESPA Integrated Disclosure ("TRID") rules which have been issued by the CFPB. A mortgage company's inability to comply with TRID would effectively eliminate its TPO business. These statements by the Acting Vice President of Sales worried several, if not all, of the employees in the TPO unit. Williamson knew that such representations were untrue because he regularly attended meetings with AMC executives where the Company's plans to ensure its TRID compliance were discussed.

24. Beginning in July, 2015, while he was contractually obliged to "devote his full business time, attention and energies to the diligent and faithful performance of his duties as an employee of AMC," Williamson, on Freedom's behalf and in violation of his Agreement with AMC, began surreptitiously contacting the TPO unit employees about leaving their employment with AMC and joining Freedom. In each of his conversations with those employees, and with the knowledge and approval of Freedom and Acree, Williamson fraudulently stated that AMC's was going to close

its TPO business.  Williamson fraudulently claimed that he learned this information from AMC's Chief Executive Officer and its President.   Williamson promised the employees that he would tell them of a new job opportunity, but only if they signed a Nondisclosure Agreement ("NDA"), true and correct examples of which are attached hereto as Exhibits 5 and 6.

25.    The NDA was an important step in the scheme of raiding AMC's TPO unit because it lulled the employees into believing that they had a legal obligation to keep the Defendants' scheme secret.

26.    The NDA itself was a violation of Williamson's employee non-solicitation covenant, and was nothing more than an unenforceable ruse to obtain the silence of the TPO employees.  Although each NDA was ostensibly only between Williamson and the employee, Freedom was the putative third party beneficiary of each NDA.  The NDA signed by Account Executives Beth Miller and Sheila Fix provide in pertinent part:

> This Nondisclosure Agreement (the "Agreement") is entered into by and between Craig Williamson and [Miller/Fix]. [sic] For the purpose of preventing the unauthorized disclosure of "Confidential Information" as defined below.  The parties agree to enter into a confidential relationship with respect to *the disclosure of certain confidential information regarding a "new job" opportunity* ("Confidential Information").   *"Interested Account Executives" may, with "a signed NDA" be presented the potential "new job" opportunity revealing that "potential employer's name" and details of the company's financial offer*

> *plus product/account offerings.   Other interested parties involved in the opportunity should not be revealed.*

(Exhibits 5 and 6, p. 1 (emphasis added)).  The NDA reveals that Freedom was aware of Williamson's solicitations of all of AMC's TPO employees because, upon the employee's execution of the NDA, Williamson had been authorized by Freedom and Acree to not only reveal Freedom's name and the "new job" opportunity, but also the financial terms that Freedom would offer to the Account Executives and Freedom's "product/account offerings" that they would be able to sell to customers.

27.   Because of Williamson's fraudulent statements during conversations with the TPO employees that Freedom and Acree knew he was making, AMC believes that all, or nearly all, of its TPO employees were induced to sign the NDA and to learn of the job opportunity they would have with Freedom since their manager had told them that they would be losing their employment with AMC when it closed the TPO unit.  The following TPO unit employees are known to have or are suspected of having signed the NDA that Williamson demanded:

Amanda Orvin
Ed Orozco
Teresa Westrand
Sheila Fix
Beth Miller
Brian Head
Michael Leonhard

Christopher McGraw
Valerie Cooke
Michael Jones
Michael McCarthy
Kevin Sipe
Rocky Amaral
Ralph Hartwig
Jeanne Mallard
David Langolis
Mike Flynn
Jill Taylor
Nancy Wright
Maria Roudas

28.     In the same period of time, and with Freedom and Acree's knowledge and approval, Williamson told the TPO unit employees who had signed the NDA to "clean out" their pipeline of loans in process. As a result, AMC's TPO locks dropped by approximately 20% percent. Even though, by accepting a paycheck each week, Williamson was representing to AMC that he was managing the performance and productivity of the TPO employees, Williamson, on behalf of Freedom, directed, encouraged and allowed several TPO employees to cease all productivity. For example, Account Executive Rocky Amaral was so efficient in "cleaning out" his pipeline that he had no active loans in his pipeline for at least a period of one month when he had previously and consistently averaged about $4 million per month in active loans. In an attempt to hide the real reason for the drop in the TPO unit's loan

activity, Williamson began to complain about the work performance of Regional Manager Gary Cain.

29.    Upon information and belief, AMC's Account Executives avoided accepting new loans from their mortgage broker/bank contacts by telling them what Williamson had falsely told them, that AMC would not be able to become TRID compliant and was going to close its TPO unit.   Other Account Executives were told to stop contacting their mortgage broker/bank contacts so that new loans would not flow to AMC.   Upon information and belief, Freedom, Acree and Williamson knew that such false information would likely be shared with account contacts by the Account Executives in order to explain why they were turning down business that was being offered them.

30.    During this same period of time, Williamson also misappropriated (in tangible form or its electronic equivalent) AMC's entire account list, including customer contact information, from AMC's CRM system and disclosed that information to at least two Freedom employees.   One of the reasons that Williamson shared AMC's TPO account information with Freedom was so that he and representatives of Freedom could divvy up AMC's accounts between Freedom's existing account executives and the AMC Account Executives that Freedom was to hire.   Upon information and belief, a substantial number of the AMC accounts were

16

not being serviced by Freedom.  In fact, one of the Account Executives, Beth Miller, learned from Williamson that only one of her current accounts had a pre-existing relationship with Freedom.   Miller learned this when Williamson showed her the account list and how he divided the list by Account Executive.

31.    AMC's account and customer lists are extremely valuable to AMC. AMC keeps its account and customer lists confidential as well as keeps these lists secret from its competitors.  If AMC's competitors had access to AMC's account and customer lists, they would gain an unfair advantage by attaining this valuable information.

32.    Freedom indicated to Williamson that he needed to bring his team with him.  Freedom and Acree knew at the time that Williamson shared AMC's account list and customer contact information that such information was AMC's confidential, proprietary and trade secret information because every company in the mortgage industry, including Freedom, considers its own account list and customer contact information to be confidential, proprietary and trade secret information.  By holding out the possibility of employment by Freedom to Williamson, Freedom and Acree induced Williamson to violate the non-disclosure covenants contained in his Agreement to steal AMC's account information from the CRM system.

33.     As of August 1, 2015, the following Regional Managers and Account Executives were employed in AMC's TPO unit: Craig Williamson, Ed Orozco, Mike Jones, Gary Cain, Amanda Orvin, Brian Head, Michael Leonhard, Teresa Wenstrand, Michael McCarthy, Rocky Amaral, Ralph Hartwig, Mike Flynn, David Langlois, Jeanne Mallard, Jill Taylor, Maria Roudas, Chuck Buchter, Debbie Morales, Denise Mills, Nancy Wright, Beth Miller, Sheila Fix, Thomas Brickel, Chris McGraw, and Kevin Sipe.   Of these employees, several had significant experience in the TPO business and had been employed by AMC for years.   Other TPO unit employees were working under a draw system and had yet to repay that draw.   Those employees were Brian Head, Michael Leonhard, Ed Orozco, Teresa Wenstrand, Chris McGraw, Michael McCarthy, Rocky Amaral, Ralph Hartwig, Kevin Sipe, David Langlois, Jeanne Mallard, and Jill Taylor, and the total amount of guaranteed pay and draw money that had not been yet earned was $112,858.75.

34.     Freedom, Acree and Williamson planned for the TPO unit to resign en masse on August 31, 2015.   Throughout the first two weeks of August, 2015, Williamson continued via email with his recruiting efforts toward the AMC employees that he was exerting on Freedom's behalf while he was being paid by AMC.   On August 6, 2015, Williamson wrote in an email to the TPO unit members regarding Freedom health care plan:

18

Folks

I'll be sending out later today.  They look good.  Lower cost as well.  401k mat .25 up to 7.5%.

(Exhibit 7).

35.     On August 8, 2015, Williamson sent e-mails to the Account Executives personal e-mail accounts asking them for their home addresses "ASAP for offer letters."  (A true and correct copy of this e-mail is attached as Exhibit 8).

## Williamson's Termination from AMC and Subsequent Events

36.     Mr. Abufaris began to observe on or about August 1, 2015 that Williamson had become difficult to reach and did not seem as involved in his job as he had been previously.  On August 15, 2015, Ms. Beth Miller, one of the TPO unit's Account Executives, spoke with Mr. Abufaris and disclosed Williamson's efforts to raid AMC's TPO unit on Freedom's behalf.  Mr. Abufaris immediately attempted to reach Williamson, and when he did not respond, Mr. Abufaris sent Williamson an email to his personal email account terminating his employment effective immediately.   The next day, Williamson sent an email to several members of the AMC TPO unit telling them that he was no longer employed by AMC.  (Exhibit 9).

37.     Through the weekend of August 14th through the 16th, Williamson relentlessly encouraged his co-workers to resign and join Freedom.  Williamson and

Freedom pressured the TPO employees to sign their offer letters from Freedom. Williamson told his co-workers that since he was leaving, AMC would be closing the TPO unit even sooner, which escalated the panic the TPO unit employees had already developed as a result of Williamson's prior misrepresentations.

38.    One TPO unit employee had already resigned on August 3, 2015 because of Williamson's actions.  As a result of Williamson and Freedom's frenzied scare tactics during the period of August 14-16, six TPO employees resigned on August 17.

**Williamson's False Sworn Statement and Freedom's Non-Denials**

39.    On August 17, 2015, AMC's counsel, Raanon Gal, wrote to Williamson demanding that he cease and desist in soliciting AMC's employees in violation of his Agreement.  Attached hereto as Exhibit 10 is a true and correct copy of the August 17, 2015 letter from Mr. Gal to Williamson.  In addition to demanding that Williamson cease in his unlawful solicitations, Mr. Gal wrote that "it has also come to our attention [] that you have falsely stated that AMC intends to close its TPO business.  In fact, we understand that you have stated that these statements were made directly from the CEO and President of the Company.  That is absolutely false."  Mr. Gal demanded that Williamson provide "a sworn statement by Friday,

August 21, 2015 that confirms you will abide by your employment agreement and will no longer make defamatory statements about AMC."

40.     Williamson apparently received Mr. Gal's letter on August 18, 2015, but it had little effect because on August 18, 2015, Williamson wrote an email to the AMC TPO Account Executives stating:

> Someone continues to violate the NDA.  In doing so it now threatens our ability to improve our livelihood for each of us and our families.  Each of you have the right to pursue any and all opportunities to improve your lives.  We are past empty promises.  Amerisave has threatened me with a "cease and desist and non-compete."  Again to intimidate us from pursuing our dreams.  This is what they think of you.  To our NDA "violator', Amerisave will "out" you in "discovery" if it makes it there.  You are now exposed to great financial risk for you and your family. *Shut your mouth*.
>
> If you have not joined yet, I can no longer be your conduit due to the above.  You are free to pursue this opportunity or others. Its [sic] your right.  Or stay at AMC.  *Any further questions will need to be directed to Freedom.*

(Exhibit 11 (emphasis added)).  Despite his assertion that he could no longer be "the conduit," Williamson continued to solicit the AMC Account Executives only one day after being told to cease and desist.  By declining to continue the role as "conduit," Williamson directly acknowledged that Freedom had been involved all along in the raiding effort he had led.

21

41.     On August 18, 2015, Mr. Gal spoke with David Altman, the Executive Vice President and Chief Corporate Counsel for Freedom and raised AMC's concerns about Freedom and Williamson's conduct.  During that conversation Mr. Altman disclaimed any knowledge of Freedom and Williamson's activities. Following that conversation, Mr. Gal sent Mr. Altman a letter covering the same points that he had raised during their telephone conversation.  (Exhibit 12).

42.     Also on August 18, 2015, one of AMC's Account Executives, Sheila Fix, wrote an email to the TPO unit's Operations Manager, Diane Carmignani in which she stated:  "I'm sad I really didn't want to leave, they pushed me and stressed me out this past weekend, *so much drama from Craig and my boss that TPO will me [sic] closing Down [sic], so I panic!!*  I really enjoyed working with you and the staff!!  I didn't wanted [sic] to leave Amerisave."  (Exhibit 13)(emphasis added). On that same day, another TPO unit employee resigned to join Freedom.

43.     On August 19, 2015, Mr. Gal spoke with Mr. Altman and his colleague Keith Joseph.  Both Mr. Altman and Mr. Joseph refused to discuss any of the specifics of Freedom's raiding and other activities, and they indicated that they needed several days to get to the bottom of AMC's allegations.  Later that day, Mr. Gal emailed Mr. Altman yet again attaching the email that Ms. Fix had sent the previous day to Ms. Carmignani.  (Exhibit 14).  As Mr. Gal explained in the email,

the "boss" to whom Ms. Fix had referred to as having "pushed" her was Regional Manager Ed Orozco ("Orozco") who, with Freedom's knowledge, Williamson had recruited to help raid the TPO unit while both were still employed by AMC. Another three TPO unit employees resigned that day to join Freedom.

44.     On August 21, 2015, Mr. Gal received a letter from Williamson's attorney, Jonathan W. Anderson. (A true and correct copy of Mr. Anderson's letter to Mr. Gal is attached hereto as Exhibit 15). In his letter, Mr. Anderson audaciously claimed that "Williamson affirmatively denies each and every allegation set forth in your August 17, 2015 letter," but that "as a sign of good faith" he was providing a "sworn affidavit." In his affidavit, which was attached to Mr. Anderson's letter, Williamson swore "that I will *continue* to abide by my employment agreement executed with my former employer Amerisave Mortgage Corporation ("AMC")." (Emphasis added). Of course, Williamson's sworn statement was untrue since he had been in violation of his Agreement since at least July of 2015. In fact, Williamson has continued to call TPO unit employees since submitting his Affidavit.

45.     From August 3, 2015 and through September 1, 2015, numerous AMC TPO unit employees have resigned and joined Freedom. After Williamson provided his "sham" affidavit, Freedom executives began soliciting AMC's Account Executives directly. As a result of the scheme orchestrated by Freedom, Acree and

Williamson, and aided and abetted by Orozco, out of 25 employees in the TPO unit, 18 have resigned, and most have joined Freedom.  Those former AMC employees are:

Amanda Orvin
Ed Orozco
Teresa Westrand
Brian Head
Michael Leonhard
Christopher McGraw
Valerie Cooke
Michael Jones
Michael McCarthy
Kevin Sipe
Rocky Amaral
Ralph Hartwig
Jeanne Mallard
David Langolis
Mike Flynn
Jill Taylor
Nancy Wright
Maria Roudas

46.    Williamson and several of the Account Executives that resigned to go to Freedom were provided corporate laptops by AMC.  These laptops contain AMC's confidential information.  AMC has requested these laptops be immediately returned.  However, despite falsely claiming that he had mailed his laptop back to AMC in late August 2015, Williamson did not return it to AMC any earlier than September 23, 2015.  Moreover, upon information and belief, he used the information on that laptop to aid Freedom's business.

## COUNT ONE
### (Violation of the Georgia Trade Secrets Act – Against All Defendants)

47.     AMC incorporates by reference the above paragraphs.

48.     AMC has developed and acquired trade secrets and confidential business information, including but not limited to account lists, through significant effort and at great expense to the Company.  The trade secrets and confidential information are not sold or given to third parties, and only certain employees have access to them.  AMC's trade secrets and confidential business information have value and have been kept secret and otherwise protected by AMC.

49.     Defendants have misappropriated AMC's trade secrets, specifically by stealing, or having Williamson steal, the TPO unit's entire list of accounts and using that information to (a) learn the identity of AMC's TPO accounts and (b) to divvy up those accounts among existing Freedom Account Executives and the AMC Account Executives who were improperly solicited to become employees of Freedom.

50.     Freedom and Acree encouraged, enticed and directed Williamson to violate the terms of his Agreement with AMC and to provide AMC's trade secrets. Defendants have acquired and have misappropriated AMC's trade secrets by improper means and knowing that the trade secrets were acquired by improper means.

25

51.     Defendants have used AMC's trade secrets without AMC's express or implied consent.

52.     Defendants' actions constitute a violation of the Georgia Trade Secrets Act, have caused and will continue to cause AMC harm, and entitle AMC to recover damages, exemplary damages, attorneys' fees and injunctive relief.

## COUNT TWO
### (Tortious Interference with the Policy – Freedom and Acree)

53.     AMC incorporates by reference the above paragraphs.

54.     Despite knowing about Williamson's obligations to AMC, Freedom and Acree intentionally, improperly and maliciously encouraged Williamson to breach the Policy by providing services to an entity that is competitive with AMC's business—Freedom—during Williamson's employment with AMC.

55.     Freedom and Acree's conduct caused Williamson to breach the Policy.

56.     Freedom and Acree's conduct was intentional, improper and done with the malicious intent to harm AMC.

57.     As a direct and proximate result of Freedom and Acree's improper, malicious and intentional interference with the Policy, AMC has suffered and continues to suffer damages in an amount to be proven at trial.

58.     AMC is entitled to punitive damages as a result of these Defendants' tortious actions in an amount to be determined by the jury.

## COUNT THREE
### (Tortious Interference with Williamson Non-solicitation and Non-disclosure covenants – Freedom and Acree)

59.    AMC incorporates by reference the above paragraphs.

60.    Despite knowing about Williamson's obligations to AMC, Freedom and Acree intentionally, improperly and maliciously encouraged Williamson to breach the employee non-solicitation and non-disclosure covenants that are contained in the Agreement.

61.    Freedom and Acree's conduct caused Williamson to breach his Agreement with AMC.

62.    Freedom and Acree's conduct was intentional, improper and done with the malicious intent to harm AMC.

63.    As a direct and proximate result of Freedom and Acree's improper, malicious and intentional interference with AMC's employee non-solicitation and non-disclosure covenants contained in Williamson's Agreement, AMC has suffered and will continue to suffer damages.

64.    AMC is entitled to punitive damages as a result of Freedom and Acree's tortious actions in an amount to be determined by the jury.

## COUNT FOUR
### (Tortious Interference with Business Relations – Against All Defendants)

65.    AMC incorporates by reference the above paragraphs.

66.     Defendants' actions as described herein, including Williamson's direction to the TPO Account Executives to "clean out" their mortgage loan pipelines, interfered with AMC's business relations with its accounts.

67.     Defendants' actions as described herein have also interfered with or are interfering with AMC's business relations with its employees and accounts.

68.     Defendants' conduct was intentional, improper and done with the malicious intent to harm AMC.

69.     As a direct and proximate result of Defendants' improper, malicious and intentional interference with AMC's business relations with its employees and accounts, AMC has suffered and continues to suffer damages in an amount to be proven at trial.

70.     AMC is entitled to punitive damages as a result of Defendants' tortious actions in an amount to be determined by a jury.

## COUNT FIVE
### (Unfair Competition – Against All Defendants)

71.     AMC incorporates by reference the above paragraphs.

72.     Defendants have intentionally and improperly solicited most of AMC's TPO employees to terminate their employment relationship with AMC and become employees of Freedom.  In doing so, Defendants have made false statements about and otherwise disparaged AMC.

73.     Defendants are motivated by ill-will toward AMC and desire to inflict harm to AMC due to that ill-will by depleting AMC of experienced employees and by misappropriating on Freedom's behalf the substantial investment in time and money that AMC has made in retaining existing employees and recruiting new employees.

74.     Defendants' conduct constitute unfair competition under Georgia law.

75.     As a direct and proximate result of Defendants' unfair competition, AMC has suffered and continues to suffer damages in an amount to be proven at trial, and punitive damages as a result of Defendants' tortious actions in an amount to be determined by the jury.

## COUNT SIX
## (Breach of Contract – Williamson)

76.     AMC incorporates by reference the above paragraphs.

77.     In his Agreement, Williamson agree that he would not, while he was employed by AMC and for a period of two years after his employment with AMC ended, solicit AMC employees to terminate their employment with AMC.

78.     Williamson further agreed that he would not use, disclose or misappropriate AMC's Confidential Information and/or Trade Secrets.

29

79.     In the Policy, Williamson agreed that he would not provide services to an entity that is competitive with AMC's business—Freedom—during his employment with AMC.

80.     By soliciting AMC's TPO employees both before and after his employment with AMC was terminated to end their employment with AMC and accept positions with Freedom, and by stealing AMC's account lists, disclosing those lists to Freedom, and using them to plan the account distribution within Freedom's TPO department, Williamson breached his Agreement with AMC.

81.     By working for and with Freedom during his employment and soliciting employees to Freedom, Williamson breached the Policy.

82.     Williamson has waived the Dispute Resolution provision contained in Section 9 a. of the Agreement as to all of AMC's claims against him in this action.

83.     AMC has suffered and will continue to suffer damages as a result of Williamson's breach of his obligations of the Agreement.

## COUNT SEVEN
## (Breach of Fiduciary Duty and Duty of Loyalty – Williamson

84.     AMC incorporates by reference the above paragraphs.

85.     As the Acting Vice President of Sales and as a Regional Manager for AMC, Williamson owed AMC a fiduciary duty and a duty of loyalty.

86.     Williamson's fiduciary duty and duty of loyalty included protecting AMC against the disclosure to and use by a competitor of its Confidential Information and Trade Secrets.

87.     Williamson's fiduciary duty and duty of loyalty including ensuring that AMC was not exposed to employee raiding by a competitor.

88.     Williamson's fiduciary duty and duty of loyalty included ensuring that all AMC TPO employees maintained a satisfactory level of revenue production.

89.     Williamson breached his fiduciary duty and duty of loyalty to AMC, including by stealing AMC's Confidential Information and Trade Secrets and providing that information to Freedom, by soliciting AMC's employees to resign from AMC and become employed by Freedom, and by directing AMC's TPO employees to "clean out" their loan pipelines.

90.     As a direct and proximate result of Williamson's breach of his fiduciary duty and duty of loyalty, AMC has suffered and continues to suffer damages in an amount to be proven at trial, and punitive damages in an amount to be determined at trial.

## COUNT EIGHT
## (Aiding and Abetting Breach of Fiduciary Duty/Duty of Loyalty – Against All Defendants)

91.     AMC incorporates by reference the above paragraphs.

92.     Defendants, through improper action and wrongful conduct and without privilege, acted to aid, abet, and procure a breach of fiduciary duties and duties of loyalty owed by Williamson (as to Freedom and Acree) and AMC's former TPO employees (as to all Defendants).

93.     With knowledge that Williamson and AMC's former TPO employees owed fiduciary duties and duties of loyalty to AMC, Defendants acted purposefully and with malice and with the intent to injure AMC.

94.     The wrongful conduct of Defendants helped procure a breach of the respective fiduciary obligations and duties of loyalty owed to AMC by Williamson and AMC's former TPO employees.

95.     This tortious conduct on behalf of Defendants proximately caused damage to AMC.

96.     AMC is thus entitled to the damages it has incurred as a result of Defendants' procurement of Williamson's and AMC's former TPO employees' breaches of their respective fiduciary obligations and duties of loyalty and usurpation of AMC's corporate opportunities, in an amount to be proven at trial, plus punitive damages in an amount to be determined by the jury.

### COUNT NINE
### (FRAUD - Theft by Taking, Theft by Deception and Theft by Conversion – Against All Defendants for Taking AMC's Funds)

32

97.     AMC incorporates by reference the above paragraphs.

98.     While employed with AMC, Williamson misrepresented to the TPO unit, at the direction of Freedom and Acree, that AMC would be closing its TPO unit because it was unable to become TPO compliant.

99.     As a result, all or most of the former AMC employees who have resigned to work for Freedom relied on Williamson's misrepresentations at the expense of AMC and were required to sign a NDA before finding out about the new job opportunity with Freedom.

100.   Williamson's misrepresentations caused several TPO Account Executives who were being paid a draw by AMC to leave before that draw had been repaid, resulting in the loss to AMC of thousands of dollars.

101.   Williamson's misrepresentations to the TPO unit employees, which were made with Freedom and Acree's approval, caused those employees to "clean out" their pipelines of active mortgage loans.  As a result of these misrepresentations, Freedom and Acree deprived AMC of the revenue it would have generated by the loans that those TPO employees turned away.

102    AMC has been damaged as a result of Williamson's misrepresentations, which were made with the knowledge and urging of Freedom and Acree, in an

amount to be proven at trial.  AMC is also entitled to an award of punitive damages on this claim in an amount to be determined by the jury.

## COUNT TEN
## (FRAUD - Theft by Taking, Theft by Deception and Theft by Conversion – Against All Defendants for Taking AMC's Trade Secrets)

103.    AMC incorporates by reference the above paragraphs.

104.    While employed with AMC, and with the knowing encouragement of Freedom and Acree, Williamson misrepresented to AMC that he would not disclose or misappropriate AMC's trade secrets and other confidential information and that he would faithfully perform his job duties and act for the benefit of AMC.

105.    Williamson, at the behest of Freedom and Acree, surreptitiously took AMC's trade secrets and confidential information while employed with AMC and provided that information to Freedom and Acree to the detriment of AMC.

106. AMC justifiably relied upon Williamson's false promises and representations that he was faithfully performing his job duties and acting for the benefit of AMC.  AMC likewise relied on Williamson's continued employment as a representation that he was a faithful AMC employee.

107.    As a result of Defendants' conduct, AMC has sustained damages in an amount to be proven at trial.  AMC is also entitled to an award of punitive damages on this claim in an amount to be determined by the jury.

**COUNT ELEVEN**
**(CONVERSION - Theft by Taking, Theft by Deception and Theft by**
**Conversion – Against All Defendants for Taking AMC's Trade Secrets)**

108.   AMC incorporates by reference the above paragraphs.

109.   While employed with AMC, Williamson converted AMC's property, at the direction of Freedom and Acree, for their own use and profit through the unauthorized taking of proprietary and confidential information to secure business opportunities for Freedom with AMC's customer account list and contact information.

110.   Defendants have taken AMC's property, knowing that it belongs to AMC, and used the property in direct competition against AMC.

111.   As a result of Defendants' conversion of AMC's property, AMC has been injured and suffered damages in an amount to be determined at trial, plus punitive damages in an amount to be determined by the jury.

**COUNT TWELVE**
**(CONVERSION - Theft by Taking, Theft by Deception and Theft by**
**Conversion – Against All Defendants for Taking AMC's Funds)**

112.   AMC incorporates by reference the above paragraphs.

113.   While employed with AMC, Williamson converted AMC's funds, with knowing encouragement and approval of Freedom and Acree, for their own use and profit through the unauthorized taking of AMC's revenue by directing AMC's TPO

unit to "clean out" their pipelines of active mortgage loans and thereby turn away loans as well as by directing employees of AMC's TPO unit who were being paid a draw by AMC to resign before that draw had been repaid, resulting in the loss to AMC of thousands of dollars.

114.   Defendants have taken AMC's property, knowing that it belongs to AMC, and used the property for their personal benefit.

115.   As a result of Defendants' conversion of AMC's property, AMC has been injured and suffered damages in an amount to be determined at trial, plus punitive damages in an amount to be determined by the jury.

## COUNT THIRTEEN
### (Defamation *Per Se* – Against All Defendants)

116.   AMC incorporates by reference the above paragraphs.

117.   Through the actions of their agent, Williamson, Freedom and Acree told AMC's TPO employees that AMC was unprepared for TRID compliance and that it was closing its TPO unit.  Such statements were untrue and defamatory.

118.   Williamson's misrepresentations to AMC's TPO employees were authorized and/or ratified by Freedom and Acree.

119.   Freedom and Acree published or allowed to be published the defamatory statements without privilege.

120.   Freedom, Acree and/or Williamson made the statements, allowed the statements to be made, and/or ratified the statements without regard to the truth of the statements, or in the alternative, made such statements out of malice toward AMC.

121.   With the knowledge of Freedom and Acree and at Williamson's urging, AMC's TPO unit employees repeated the defamatory statements to AMC's customers when they turned down loans as they were "cleaning out" their pipelines of loans before they resigned.

122.   Pursuant to Georgia law, the defamatory statements constitute defamation *per se.*

123.   AMC's reputation was damaged as a result of the defamatory statements.

124.   AMC has suffered and is continuing to suffer damages and loss of business relationships as a result of the defamatory statements.

125.   AMC is entitled to recover damages from Freedom and Acree for this defamation *per se* in an amount to be proven at trial, plus punitive damages in an amount to be determined by the jury.

## COUNT FOURTEEN
### (Civil Conspiracy – Against All Defendants)

126.   AMC incorporates by reference the above paragraphs.

127.   Williamson, Freedom and Acree, between and among themselves and with others, engaged in an unlawful scheme aimed against AMC.

128.   The unlawful acts that underlie their scheme include the misappropriation of trade secrets and other confidential information, tortious interference with contracts and business relationships, unfair competition, theft by taking, deception and conversion, and defamation *per se*.

129.   Defendants met and communicated on numerous occasions to carry out this scheme, including when Williamson was still employed by AMC and during work hours.

130.   Defendants are severally and jointly liable as co-conspirators, and AMC is entitled to the damages it has incurred as a result of Williamson, Freedom and Acree's conspiracy to commit the torts as alleged, in an amount to be proven at trial, and punitive damages as a result of Defendants' tortious actions in an amount to be determined by the jury.

### COUNT FIFTEEN
### (Computer Theft – Against All Defendants)

131.   AMC incorporates by reference the above paragraphs.

132.   Through their agent, Williamson, Freedom and Acree obtained access to AMC's CMR system in order to take and appropriate AMC's account list.

133.   Freedom and Acree knew or should have known that Williamson, as an employee of AMC, had signed an Agreement containing a non-disclosure covenant and was not authorized to take the account list and provide it to Freedom and Acree.

134.   Defendants have engaged in computer theft in violation of the Georgia Computer Systems Protection Act and in violation of Williamson's Agreement.

135.   Under O.C.G.A. § 16-9-93(g), AMC is entitled to damages for Defendants' computer theft, including lost profits.

### COUNT SIXTEEN
### (Violation of O.C.G.A. § 16-14-4(a) of the Georgia Racketeer Influenced and Corrupt Organizations Act ("Georgia RICO" – All Defendants)

136.   AMC incorporates by reference the above paragraphs.

137.   The acts of Defendants, which include the acts of theft by taking, deception and conversion, fraud and computer theft constitute "racketeering activit[ies]" within the meaning of O.C.G.A. § 16-14-3(5)(A).

**Defendants' Theft by Taking in Violation of O.C.G.A. § 16-8-2**

138.   Defendants have committed Theft by Taking under the facts alleged in Counts NINE and TEN – Fraud and Counts ELEVEN AND TWELVE - Conversion, above.

139.   A violation of O.C.G.A. § 16-8-2 (Theft by Taking) constitutes an act of "Racketeering Activity" within the meaning of O.C.G.A. § 16-14-3(5)(A)(xii).

**Defendants' Theft by Deception in Violation of O.C.G.A. § 16-8-2**

140.   Defendants have committed Theft by Deception under the facts alleged in Counts SEVEN and EIGHT – Fraud and Counts NINE AND TEN - Conversion, above.

141.   A violation of O.C.G.A. § 16-8-3 (Theft by Deception) constitutes an act of "Racketeering Activity" within the meaning of O.C.G.A. § 16-14-3(5)(A)(xii).

**Defendants' Theft by Conversion in Violation of O.C.G.A. § 16-8-4**

142.   Defendants have committed Theft by Conversion under the facts alleged in Counts NINE and TEN – Fraud and Counts ELEVEN AND TWELVE - Conversion, above.

143.   A violation of O.C.G.A. § 16-8-4 (Theft by Conversion) constitutes an act of "Racketeering Activity" within the meaning of O.C.G.A. § 16-14-3(5)(A)(xii).

**Defendants' Computer Theft in Violation of O.C.G.A. § 16-9-93(a)**

144.   Defendants have committed Computer Theft under the facts as alleged in Count FIFTEEN above.

145.   A violation of O.C.G.A. § 16-9-93(a) constitutes an act of "Racketeering Activity" within the meaning of O.C.G.A. § 16-14-3(5)(A)(xix).

146.   Defendants have engaged in a "pattern of racketeering activities" within the meaning of O.C.G.A. § 16-14-3(8) because they committed or attempted to

commit "at least two incidents of racketeering activity that have the same or similar intents, results, accomplices, victims, or methods of commission or otherwise are interrelated by distinguishing characteristics and are not isolated incidents . . . ."

147.   Defendants have violated O.C.G.A. § 16-14-49(a) by acquiring and/or maintaining, directly and/or indirectly, interests and/or control of personal property belonging to AMC.

148.   Because of Defendants' violation of O.C.G.A. § 16-14-4(a), AMC has been injured within the meaning of O.C.G.A. § 16-14-6.

149.   AMC is an "aggrieved person[s]" within the meaning of O.C.G.A. § 16-14-6 and AMC is therefore entitled to the civil remedies set forth in O.C.G.A. § 16-14-6, including treble damages, punitive damages and attorneys' fees.

## COUNT SEVENTEEN
### (Injunctive Relief – Against All Defendants)

150.   AMC incorporates by reference the above paragraphs.

151.   AMC has a reasonable likelihood of success on the merits of its claims in this action.

152.   The misconduct of Defendants will cause irreparable harm to AMC for which it cannot be compensated adequately in damages, including for the breach of contract by Williamson and the loss of its trade secrets and confidential business information and for the unfair competition/tortious interference that will result from

Defendants' raiding of AMC's work force.  AMC also cannot be compensated adequately in damages for the loss of business caused by Defendants.

153.   The injunctive relief sought by AMC will not disservice the public interest.  The public interest in protecting trade secrets is well-established in Georgia law, including in the Georgia Trade Secrets Act.

154.   The balance of equities favors the entry of injunctive relief.  Courts may enter injunctive relief to preserve the status quo until final hearing.

155.   Injunctive relief will preserve the status quo pending a trial on the merits.

156.   AMC is thus entitled to preliminary and permanent injunctive relief.

**COUNT EIGHTEEN**
**(Attorneys' Fees and Expenses of Litigation – Against All Defendants)**

157.   AMC incorporates by reference the above paragraphs.

158.   AMC is entitled to recovery of its attorneys' fees and court costs pursuant to the Georgia Trade Secrets Act and O.C.G.A. § 16-14-6.

159.   Moreover, Defendants have acted in bad faith toward AMC in the events giving rise to this lawsuit, have been stubbornly litigious, and have put AMC to unnecessary trouble and expense.  Pursuant to O.C.G.A. § 13-6-11, AMC is entitled to recover from Defendants its expenses of litigation, including reasonable attorneys' fees in an amount to be proven at trial.

## PRAYER FOR RELIEF

AMC specifically requests as follows:

a.      that AMC receive a trial by jury on all issue so triable;

b.      that the Court enter judgment against Defendants for their violation of the Georgia Trade Secrets Act, and an award of damages, exemplary damages, costs and attorneys' fees to AMC, all in amounts to be proven at trial;

c.      that the Court enter judgment against Defendants for their tortious interference with contracts and business relations, and an award of damages to AMC in an amount to be proven at trial;

d.      that the Court enter judgment against Defendants for their unfair competition, and an award of damages to AMC in an amount to proven at trial;

e.      that the Court enter judgment against Williamson for his breach of contract, and an award of damages to AMC in an amount to be proven at trial;

f.      that the Court enter judgment against Williamson for his breach of fiduciary duty and duty of loyalty, and award  damages to AMC in an amount to be proven at trial;

g.      that the Court enter judgment against Defendants for their aiding and abetting breach of fiduciary duty and duty of loyalty, and award damages to AMC in an amount to be proven at trial;

43

h.      that the Court enter judgment against Defendants for their defamation *per se* against AMC, and award damages to AMC in an amount to be proven at trial;

i.      that the Court enter judgment against Defendants for their fraud, and award damages to AMC in an amount to be proven at trial;

j.      that the Court enter judgment against Defendants for punitive damages, on those claims to which AMC is entitled to such relief, in an amount to be determined by the jury;

k.      that the Court enter judgment against Defendants for their violation of the Georgia Computer Systems Protection Act, and award damages to AMC in an amount to be proven at trial:

l.      that the Court enter judgment against Defendants, jointly and severally as alleged in the Complaint, in amount(s) to be proven at trial, including awarding against each Defendant actual, special, consequential and/or compensatory damages, including lost profits;

m.      that the Court enter judgment against Defendants for their violation of Georgia RICO, and award damages to AMC in an amount three times its actual damages, plus punitive damages and attorneys' fees and costs of litigation reasonably incurred;

n.      that the Court enter judgment against Defendants for their engagement in a civil conspiracy, and award damages to AMC in an amount to be proven at trial;

o.      that the Court enter a preliminary and permanent injunction precluding Defendants from using or disclosing AMC's trade secrets and confidential business information;

p.      that the Court enter a preliminary and permanent injunction precluding Williamson from violating the employee non-solicitation and non-disclosure covenants in his Agreement;

q.      that the Court enter judgment against Defendants for AMC's attorneys' fees, costs, and litigation expenses as otherwise specifically permitted by law; and

r.      that the Court grant and award AMC such other and further relief against Defendants to which it is entitled.

Respectfully submitted this 28th day of September, 2015.

**TAYLOR ENGLISH DUMA LLP**

*/s/Raanon Gal*
Michael Eric Ross
GA Bar No. 615190
Steven J. Whitehead
GA Bar No. 755480
Raanon Gal
GA Bar No. 100281
1600 Parkwood Circle, Suite 400
Atlanta, GA 30339

Telephone: (770) 434-6868
Facsimile: (770) 434-7376
mross@taylorenglish.com
swhitehead@taylorenglish.com
rgal@taylorenglish.com

## <u>LOCAL RULE 7.1D CERTIFICATION</u>

I hereby certify that the foregoing complies with the font and point requirements of LR 5.1, to wit, this brief was prepared in Times New Roman font, 14-point type.

**TAYLOR ENGLISH DUMA LLP**

*/s/Raanon Gal*
Raanon Gal
Georgia Bar No. 100281

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on this 28th day of September, 2015, a copy of the foregoing was filed by ECF and served upon counsel of record via electronic notification.

*/s/Raanon Gal*
Raanon Gal
Georgia Bar No. 100281
**TAYLOR ENGLISH DUMA LLP**
1600 Parkwood Circle, Suite 400
Atlanta, Georgia 30339
Telephone: (770) 434-6868
Facsimile: (770) 434-7376
rgal@taylorenglish.com

*ATTORNEYS FOR PLAINTIFF*
*AMERISAVE MORTGAGE*
*CORPORATION*